**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

   **Plaintiff,**

vs.             **NO. CR 08-2665 RB**

MICHAEL ANTHONY McCARTHY,

   **Defendant.**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**AND ORDER DENYING MOTION TO SUPPRESS**

   THIS MATTER came before the Court on Defendant Michael Anthony McCarthy's Motions to Suppress Statements, filed February 20, 2009 and March 20, 2009.  The Court held an evidentiary hearing on these motions on April 21, 2009.  Having considered the submissions of counsel, evidence adduced at the hearing, relevant law, and being otherwise fully advised, the Court issues the following findings of fact and conclusions of law and denies Mr. McCarthy's Motions to Suppress Statements.      **FINDINGS OF FACT**

   1.  The two-count Indictment charges Mr. McCarthy with: (Count 1) conspiracy to possess with intent to distribute 100 kilograms and more of a mixture and substance containing a detectable amount of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 21 U.S.C. § 846, and (Count 2) possession with intent to distribute 100 kilograms and more of a mixture and substance containing a detectable amount of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2.

   2. This matter is set for jury trial on May 5, 2009.

   3.  Mr. McCarthy filed motions to suppress on February 20, 2009 (Doc. 43) and March 20,

2009 (Docs. 51 and 53).  Mr. McCarthy's three motions to suppress are virtually identical.  Mr. McCarthy contends in his written motions that the New Mexico Motor Transportation Division and the United States Drug Enforcement Administration (hereinafter "DEA") violated his Sixth Amendment right to counsel and that any waiver of his *Miranda* rights[1] was not knowing and voluntary.  At the April 21, 2009 evidentiary hearing, however, it became evident that Mr. McCarthy actually contends that he was subjected to custodial interrogation after invoking his *Miranda* right to remain silent and that any waiver of his *Miranda* rights was not knowing and voluntary.

4.  The United States filed Responses on February 25, 2009 (Doc. 45), March 24, 2009 (Doc. 56), and March 31, 2009 (Doc. 59), arguing that Mr. McCarthy voluntarily, knowingly, and intelligently waived his rights, that his statements were voluntary and not the product of coercion, and that any invocation by Mr. McCarthy of his rights was ambiguous and equivocal.

5.  Mr. McCarthy is a Jamaican national of approximately 45 years of age.  He is of average intelligence.  The record does not reflect what level of education Mr. McCarthy attained.  He does not have any apparent physical or mental health conditions.

6.  On August 15, 2008, at 2:10 A.M., Mr. McCarthy was taken into custody by Sergeant Robert Barrera[2] at the New Mexico Motor Transportation Division (hereinafter "MTD") Port of Entry on Interstate 10 eastbound in Lordsburg, New Mexico after approximately 800 pounds of marijuana was found in the trailer of the semi-truck Mr. McCarthy was driving.[3]

7.  After taking Mr. McCarthy into custody, Sergeant Barrera advised him of his *Miranda*

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The Court takes judicial notice of the fact that the Sergeant Barrera referred to in the record is Sergeant Robert Barrera.

[3] 800 pounds is approximately 362 kilograms.

rights.[4]

8.  Agent William Chadborn and Agent Corey Watkins are employed by the New Mexico State Police.  They are assigned to the Border Operations Task Force, which has responsibility to investigate narcotics-related crimes.

9.  At approximately 3:00 A.M., Agent Chadborn received a telephone call at his home in Animas, New Mexico, informing him that a large quantity of marijuana had been seized at the Lordsburg Port of Entry and dispatching him to investigate.  Around the same time period, Agent Watkins also received a telephone call at his home in Hatch, New Mexico, dispatching him to the Lordsburg Port of Entry to investigate the alleged crime.  Agent Watkins was informed that Agent Chadborn would also be working on the investigation, and the two officers communicated via telephone as they drove from their respective homes to Lordsburg.

10.  Agent Chadborn arrived at the Lordsburg Port of Entry at approximately 3:45 A.M. After receiving a short briefing from Sergeant Barrera about the case, Agent Chadborn began his investigation, examining the truck, taking photographs, looking through the logbook, and making copies of documents.

11.  When Agent Chadborn arrived, Mr. McCarthy was lying down on an approximately twelve-inch-wide, metal bench located across from the computer terminals, inside one of the office buildings at the Lordsburg Port of Entry.  Mr. McCarthy's right arm was handcuffed to a bar on the metal bench.

12.  Agent Watkins arrived at the Lordsburg Port of Entry at approximately 4:45 A.M.  At the time of Agent Watkins' arrival, Agent Chadborn was conversing with Sergeant Barrera.  After

_____

[4]The admissibility of any statement Mr. McCarthy may have made to Sergeant Barrera was not raised at this suppression hearing.

some preliminary conversation, Agent Watkins received a briefing from Sergeant Barrera regarding the arrest.  Agent Watkins then conducted a cursory investigation of the semi-truck that Mr. McCarthy had been driving.  Throughout this time, Mr. McCarthy was asleep on the metal bench.

13.  Agents Chadborn and Watkins awoke Mr. McCarthy, removed the handcuff from the bar on the metal bench and placed the handcuffs so as to be in front of his body.  The Agents gave Mr. McCarthy the opportunity to use the bathroom and get a drink of water, and escorted him into a nearby office.  The room was approximately twelve feet by twelve feet in size.  It contained at least three chairs and a desk with a computer and other personal items on it.

14.  Agents Chadborn and Watkins were dressed in plain clothes.  Agent Chadborn carried a concealed weapon.  Agent Watkins did not carry a weapon.  Agent Chadborn had a cassette recorder he used to capture the custodial interview of Mr. McCarthy.  Agent Watkins had a digital recording devise he used to capture the custodial interview of Mr. McCarthy.  The Agents did not activate their recording devices at the same time.

15.  Exhibit A is a copy of the cassette recording taken by Agent Chadborn of the custodial interview of Mr. McCarthy.  Exhibit B is a copy of the digital recording taken by Agent Watkins of the custodial interview of Mr. McCarthy.  Exhibit B is a much clearer sound recording.  Exhibit A and Exhibit B contain overlapping material, but they are not identical sound recordings.  00:00-03:33 of Exhibit A is not contained on Exhibit B.  00:00-04:48 of Exhibit B is not contained on Exhibit A.  03:34-46:55 of Exhibit A appears to contain the same material as 04:49-50:07 of Exhibit B.  50:08-01:23:36 of Exhibit B is not contained on Exhibit A. The variation in length of the overlapping section of Exhibit A and Exhibit B is unexplained.

16.  Mr. McCarthy has a heavy Jamaican accent.  His speech is often sprinkled with Patois. During the interview, Mr. McCarthy had a tendency to mumble, rendering his speech unintelligible.

The Agents indicated at various points during the interview that they had difficulty understanding Mr. McCarthy. Mr. McCarthy, on the other hand, stated that he had no difficulty understanding the Agents.

17. At approximately 5:20 A.M., Agent Chadborn had the following exchange with Mr. McCarthy, which is recorded on Exhibit A at 01:14-02:00. During the following exchange between Agent Chadborn and Mr. McCarthy, Agent Watkins was standing outside the doorway of the room conversing with Sergeant Barrera.

AGENT CHADBORN: Alright ... uh ... Just wanted to let you know that ... uh ... Did you invoke your rights, or did you tell them that you didn't want to talk to anybody or that you wanted an attorney present or anything like that?

MR. McCARTHY: Unintelligible.

AGENT CHADBORN: Okay. I, I, I can't ... I'm having a hard time understanding you.

MR. McCARTHY: I said, I don't want any ... I don't want nothing to say to anyone.

AGENT CHADBORN: You don't have anything to say to anybody?

MR. McCARTHY: No.

AGENT CHADBORN: Okay. Did, did ... when they read you your rights ...

MR. McCARTHY: What rights?

AGENT CHADBORN: Did, did they read you your *Miranda* warnings?

MR. McCARTHY: What rights do I have?

AGENT CHADBORN: Okay. We'll get through that right now.

18. Immediately following the preceding exchange, Agent Chadborn attempted to advise Mr. McCarthy of his rights. Before Agent Chadborn could begin reading the *Miranda* warning, however, Mr. McCarthy expressed his preference to read the *Miranda* warnings himself and asked

Agent Chadborn to retrieve his glasses from the truck.  After a short exchange with Mr. McCarthy, Agent Chadborn turned off his cassette recorder and went out to the truck to retrieve Mr. McCarthy's glasses.

19.  After Agent Chadborn had returned with Mr. McCarthy's glasses, at approximately 5:35 A.M., Agents Chadborn and Watkins entered the room to introduce themselves and explained their role as investigating officers.  Mr. McCarthy asked the Agents to "get to the point."  Agent Chadborn then explained that the Agents were there to ascertain whether or not Mr. McCarthy wished to cooperate.  Mr. McCarthy asked the Agents "What is the cooperation?" and began to explain the ways in which he had cooperated with the arresting law enforcement officers.  At that point, Agent Watkins explained that they needed to read Mr. McCarthy his *Miranda* warnings.

20.  At 5:40 A.M., Agent Chadborn read Mr. McCarthy the *Miranda* warnings.  Mr. McCarthy verbally acknowledged that he understood his rights and wrote his initials by each statement of rights, signifying that he understood each of his rights.

21.  After reading Mr. McCarthy his rights, the Agents had the following exchange with Mr. McCarthy.  The exchange is recorded on Exhibit B at 08:55-10:33.

AGENT CHADBORN: And then ... uh ... if you agree to talk to us ... if you could print your name and sign your name.  And, like he said, you can stop that at any time.  If you don't want to talk to us right now, that's fine. But, if you want to talk to us for a little bit ...

MR. McCARTHY: And if I no want to talk to you, what the next step?

AGENT WATKINS: That's it.

AGENT CHADBORN: Then the next step is ...

AGENT WATKINS: You're done. You're going to go to jail.

MR. McCARTHY: And if I talk to you?

6

AGENT WATKINS: Then, you're going to go to jail.  I'm, I'm not telling you that you aren't going to jail.

MR. McCARTHY:  Well, put me in a jail.

AGENT WATKINS:  Okay.

MR. McCARTHY:  Ah, ah ... You see, useless.

AGENT WATKINS:  Well, I tell you what.  Let me explain it.

MR. McCARTHY:  Unintelligible.

AGENT WATKINS:  Okay. Hold on. Relax, relax. Look, look ...

MR. McCARTHY:  Unintelligible ... Jail me. Put me in a jail.

AGENT WATKINS:  Listen. What did you think was going to happen? You drove up with, with that much weight of marijuana. Did you think you were going to say, "Oh, sorry," and then walk away.  I mean, really?  What did you think was going to happen?

MR. McCARTHY: What?

AGENT WATKINS:  Did you think there was not going to be any consequences for that? What I'm ... what we are trying to do, is, is ... uh ... by, by talking to you, we find out what happened.  Okay. As much as you want to tell us.

AGENT CHADBORN:  Your side of the story.

AGENT WATKINS:  If, if, if you, if you, don't have a side in the story then ...

MR. McCARTHY:  I don't have a side in the story.

AGENT WATKINS:  If, if you don't have anything, if you don't have anything ...

MR. McCARTHY:  I don't.

AGENT WATKINS:  Well then, that's fine.  Then uh ... then uh ... it's going to go to the Assistant U.S. Attorney, and then she's going to go to court and say: "This man showed no remorse. He

7

showed no interest in, in helping with what happened with this, this marijuana by the truck. And the reason for that is because he was going to make a lot of money on it. It's his dope. And that's why he showed no remorse and doesn't care." That's what's going to happen to you. I'm telling you right now.

22. Agent Watkins then told Mr. McCarthy that he was facing about ten years in prison, that the federal system had mandatory minimums, that he would spend at least eighty percent of any sentence he received in jail, and that no jury would ever believe that he was innocent.  Agent Watkins went on to explain the criminal justice process, emphasizing that Mr. McCarthy had been accused of a crime, but that he was not yet considered guilty.

23. Mr. McCarthy asked a couple of questions regarding the authority of the Agents to make a deal with him, especially regarding the possibility of Mr. McCarthy participating in a controlled delivery of the marijuana.  The Agents responded by explaining that Mr. McCarthy would have to waive his rights if he wanted to discuss these types of options.  The Agents also repeatedly emphasized that, if Mr. McCarthy wanted to talk to them, then he would have to waive his rights, and if he did not want to talk to them, then he should say so, and the interview would be over.

24. Mr. McCarthy then asked what the next step would be if he did not sign the waiver of rights.  Agent Watkins responded, "It's none of your business."  Agent Watkins went on to explain that Mr. McCarthy would have to go to jail.

25. At different points, Mr. McCarthy accused Agent Watkins of being aggressive and of bullying him. After being accused of being aggressive, Agent Watkins apologized to Mr. McCarthy and said that he did not mean to be aggressive, but that Mr. McCarthy needed to make a decision and stop playing games.

26. Agent Watkins repeatedly explained that he could not have a conversation with Mr.

McCarthy about anything substantial unless he stopped "screwing around" and made a decision regarding whether or not he wanted to waive his rights.  The following excerpt, captured on Exhibit B at 16:15-16:50, is typical of several attempts by the Agents to explain to Mr. McCarthy that they could not talk with him unless he made a decision to waive his rights.

AGENT WATKINS:  "You need to make a choice.  Do you want to help yourself out, or do you want to ... uh ... call this a day?  It's not, it's not complicated.  You can stop talking to us any time you want.  You can sign this, that you want to talk to us, and we'll talk. And any time during that, if you want to stop, you can stop.  Okay.  I'm just saying that, in order to get started, to have a conversation, you've got to waive your rights.  If you don't want to waive your rights, then that's fine, don't waive your rights and then we're done; I'm not going to talk to you any more, because I can't.  It's against the law.  You understand?  I'm following the law."

27.  Mr. McCarthy signed the waiver of rights form at 5:54 A.M. on August 15, 2008.  Agents Chadborn and Watkins also signed the form as witnesses.

28.  After signing the waiver of rights form, Mr. McCarthy had the following exchange with the Agents, captured on Exhibit B at 22:59-23:16:

MR. McCARTHY: Ask the question. I signed that.

AGENT CHADBORN: Okay.  Alright. So, so you did ... you signed your, your rights and said you did understand them ...

MR. McCARTHY: Yeah. Ask the question ...

AGENT CHADBORN: And you agree to talk to us at this time.

MR. McCARTHY: Whatever I answer ... Yeah, I'm going to talk.

AGENT CHADBORN: Okay.

MR. McCARTHY: Whatever I can answer, I answer. Whatever I can't, I leave that alone.

29.  After Mr. McCarthy signed the waiver of rights form, he made several inculpatory statements to the Agents.

30.  During the interview, Mr. McCarthy sat at one side of the desk and Agents Chadborn and Watkins sat on the other side at the corners of the desk.  For the majority of the interview, Mr. McCarthy sat slumped in his chair. Mr. McCarthy was handcuffed, with his arms in the front of his body, for the duration of the interview. Mr. McCarthy stood up on a couple of occasions during the interview and was commanded to sit down by Agent Watkins.

31.  The tone of the interview was at times cordial and at other times more adversarial, with Agent Watkins and Mr. McCarthy each expressing frustration at various points during the interview. Agent Watkins raised his voice and sounded exasperated on a number of occasions.  Mr. McCarthy was at times dismissive of the Agents and made several sarcastic statements. However, Mr. McCarthy generally maintained a nonchalant demeanor.  Agent Chadborn maintained a reasonably good rapport with Mr. McCarthy throughout the interview.

32.  The interview never became threatening.  At no time did the Agents physically coerce, verbally abuse, or otherwise threaten Mr. McCarthy.  At no time did Agent Chadborn brandish his weapon or otherwise use his weapon to intimidate Mr. McCarthy.

33.  The Agents ended their questioning of Mr. McCarthy at approximately 7:00 A.M.  The entire interview of Mr. McCarthy lasted approximately 1 hour and 40 minutes.

34.  After Mr. McCarthy was interviewed by Agents Chadborn and Watkins, he was taken to a branch office of the DEA.  Mr. McCarthy arrived at the DEA office at approximately 10:30 A.M.  Mr. McCarthy was handcuffed when he arrived at the DEA office.

35.  Special Agent Eric Hansen, who works for the DEA, had a short conversation with Mr. McCarthy in the DEA prisoner processing area.  Special Agent Hansen was wearing plain clothes,

and he was not carrying a weapon.  Agent Watkins and Special Agent Amy Billhymer were also present in the room during Special Agent Hansen's short conversation with Mr. McCarthy.  The tone of Special Agent Hansen's exchange with Mr. McCarthy was conversational.

36.  Special Agent Hansen did not re-advise Mr. McCarthy of his *Miranda* rights before asking him questions.  During the conversation, which lasted less than five minutes, Mr. McCarthy made at least one inculpatory statement.  Mr. McCarthy remained in the DEA prisoner processing area for the better part of an hour, as Special Agent Hansen and the others attended to various administrative matters.

## CONCLUSIONS OF LAW

1.  An individual who is suspected of a crime and subjected to custodial interrogation has a privilege against compulsory self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). This Fifth Amendment privilege is secured by the *Miranda* rule, which mandates that statements taken during a custodial interrogation cannot be admitted at trial to establish the guilt of the accused unless the government has provided the individual with a full and effective warning of his rights at the outset of the interrogation process and the accused has voluntarily, knowingly, and intelligently waived his rights. *Id.*

2.  The term "interrogation" has been legally defined as express questioning or its functional equivalent on the part of law enforcement officials that they should have known were reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980). Words and actions that are "normally attendant to arrest and custody" do not constitute interrogation, and law enforcement officials cannot be held accountable for the unforeseeable results of their words or actions. *Id.*  Advising or re-advising the accused of his rights does not constitute interrogation. *See Michigan v. Mosley*, 423 U.S. 96, 106 (1975); *Innis*, 446 U.S. at 301-02.

11

3.  If the suspect talks to the government, after being advised of his right to remain silent, the government bears the burden of proving by a preponderance of the evidence that the waiver of rights was voluntary. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  "To establish a waiver of Fifth Amendment rights, the government must show (1) that the waiver was voluntary in the sense that it was a product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving." *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996).  The voluntariness of a waiver is evaluated based on the totality of the circumstances surrounding the interrogation. *Id.*

4.  Relevant circumstances the Court must consider in evaluating voluntariness include (1) the presence or absence of police coercion, (2) the length, location, and continuity of the interrogation, (3) the accused's maturity, education, physical condition, and mental health, and (4) whether law enforcement officials advised the accused of his rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).

5.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74.  "The *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 636 (2004); U.S. Const., Amdt. 5 (providing that "[n]o person ... shall be compelled in any criminal case to be a witness against himself").

6.  If the suspect makes a statement that is ambiguous or equivocal, law enforcement officials are not required to cease questioning. *Davis v. United States*, 512 U.S. 452, 459 (1994); *United States v. Nelson*, 450 F.3d 1201, 1211-12 (10th Cir. 2006) (applying *Davis* to the right to remain silent).  Indeed, a law enforcement official is not required to stop the interrogation unless the suspect

articulates his desire to invoke his rights with sufficient clarity that a reasonable law enforcement official in the circumstances would understand the statement to be an assertion of his rights. *Davis*, 512 U.S. at 459.

7.  "Although the context and nuances of a request to end questioning can create ambiguity, they cannot overcome a clear expression of the desire to remain silent."  *United States v. Rambo*, 365 F.3d 906, 910 (10th Cir. 2004).  Interpretation of whether the defendant invoked his right to remain silent is "only required where the defendant's words, understood as ordinary people would understand them, are ambiguous" *See United States v. March*, 999 F.2d 456, 460 (10th Cir. 1993).

8.  Once the suspect has invoked his rights, knowledge of his invocation is imputed to all law enforcement officers who subsequently deal with the suspect. *See United States v. Scalf*, 708 F.2d 1540, 1544 (10th Cir. 1983).

9.  Law enforcement officials may renew questioning of a suspect who has once exercised his right to remain silent, provided the suspect's "right to cut off questioning" is "scrupulously honored." *Mosley*, 423 U.S. at 104.  Officers can reinitiate questioning only if: (1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation was unrelated to the first. *Id*. at 106.

10.  Law enforcement officials must move to end the encounter once the accused has invoked his right to remain silent, and they may not play an active role in continuing an interview once the accused has invoked his rights. *Rambo*, 365 F.3d at 911.  Indeed, refusing to discontinue the interrogation upon request or persisting in repeated efforts to wear down the resistance of the accused and make him change his mind are clear violations of the accused's privilege against self-incrimination. *See Mosley*, 423 U.S. at 105-06.

13

11.  "A promise to bring any cooperation on the part of the defendant to the court's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible." *United States v. Glover*, 104 F.3d 1570, 1582 (10th Cir. 1997) *abrogated on other grounds by Corley v. United States*, --- S.Ct. ---- , 2009 WL 901513 (2009) (quoting *United States v. Baldacchino*, 762 F.2d 170, 179 (1st Cir. 1985)).

12.  On August 15, 2008, Mr. McCarthy was in police custody at all times after 2:10 A.M. Indeed, a reasonable person in Mr. McCarthy's position would have understood himself to have been in police custody. *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993).

13.  Mr. McCarthy did not make any statements that could "reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (emphasis omitted).

14.  It is necessary for the Court to analyze the following three exchanges as possible invocations by Mr. McCarthy of his right to remain silent:

### *STATEMENT 1*

AGENT CHADBORN:  Alright ... uh ... Just wanted to let you know that ... uh ... Did you invoke your rights, or did you tell them that you didn't want to talk to anybody or that you wanted an attorney present or anything like that?

MR. McCARTHY:  Unintelligible.

AGENT CHADBORN:  Okay.  I, I, I can't ... I'm having a hard time understanding you.

MR. McCARTHY:  I said, I don't want any ... I don't want nothing to say to anyone.

AGENT CHADBORN:  You don't have anything to say to anybody?

MR. McCARTHY:  No.

AGENT CHADBORN:  Okay. Did, did ... when they read you your rights ...

MR. McCARTHY:  What rights?

AGENT CHADBORN:  Did, did they read you your *Miranda* warnings?

MR. McCARTHY:  What rights do I have?

AGENT CHADBORN:  Okay. We'll get through that right now.

### STATEMENT 2

MR. McCARTHY: And if I no want to talk to you, what the next step?

AGENT WATKINS: That's it.

AGENT CHADBORN: Then the next step is ...

AGENT WATKINS: You're done. You're going to go to jail.

MR. McCARTHY: And if I talk to you?

AGENT WATKINS: Then, you're going to go to jail.  I'm, I'm not telling you that you aren't going to jail.

MR. McCARTHY:  Well, put me in a jail.

### STATEMENT 3

AGENT WATKINS: ... What I'm ... what we are trying to do, is, is ... uh ... by, by talking to you, we find out what happened.  Okay.  As much as you want to tell us.

AGENT CHADBORN:  Your side of the story.

AGENT WATKINS:  If, if, if you, if you, don't have a side in the story then ...

MR. McCARTHY:  I don't have a side in the story.

AGENT WATKINS:  If, if you don't have anything, if you don't have anything ...

MR. McCARTHY:  I don't.

AGENT WATKINS:  Well then, that's fine. ...

　　　15.  Statement 1 is best characterized as a difficult to understand expression by Mr.

McCarthy of his desire to remain silent, which was immediately contradicted by an expression of his willingness to engage in a conversation with Agent Chadborn regarding his rights.  It is a statement that is neither a clear invocation of the right to remain silent, nor a statement that can be easily classified as equivocal or ambiguous.  Determining the legal significance of Statement 1 is rendered all the more difficult by the following factors: (1) the close proximity of two legally conflicting statements by Mr. McCarthy, (2) the fact that Mr. McCarthy interrupted Agent Chadborn–who was about to ask a non-interrogation question–and initiated a discussion about his rights, and (3) the presence of barriers to communication during the exchange, including Mr. McCarthy's heavy Jamaican accent and his tendency to mumble. *See Mosley*, 423 U.S. at 104-06; *Innis*, 446 U.S. at 301-02; *Oregon v. Bradshaw*, 462 U.S. 1039, 1041-42 (1983).

16.  Statement 2 is equivocal and does not constitute an invocation of the right to remain silent. *Nelso*n, 450 F.3d at 1212-13.  Indeed, the Tenth Circuit has specifically held that the statement "I guess I'm ready to go to jail then" does not constitute an invocation of the right to remain silent. *Id*.

17.  Statement 3 is also equivocal and does not constitute an invocation of the right to remain silent. *Id*.  Indeed, Statement 3 is more akin to an assertion of ignorance than an invocation of rights. The Court, therefore, concludes that a reasonable law enforcement official in the circumstances would not have understood Statement 3 to be an assertion by Mr. McCarthy of his right to remain silent. *See Davis*, 512 U.S. at 459; *Nelso*n, 450 F.3d at 1212-13.

18.  The Court, concluding that Statement 1 is the only exchange for which there is a genuine legal issue regarding whether it constituted an invocation of the right to remain silent, will analyze that exchange in the broader context of the custodial interrogation of Mr. McCarthy by Agents Chadborn and Watkins.

19.  The Court believes that ordinary people and reasonable law enforcement officials would understand a clear articulation of the phrase "I don't want nothing to say to anyone" as an invocation of the right to remain silent.  *See March*, 999 F.2d at 460; *Davis*, 512 U.S. at 459; *Nelso*n, 450 F.3d at 1212-13.  The Court, however, is sympathetic to the facts that Agent Chadborn evidently had difficulty understanding Mr. McCarthy and could not have been entirely certain whether he wished to invoke his right to remain silent.  Indeed, having witnessed Agent Chadborn's testimony and having compared it with the sound recordings on Exhibit A and Exhibit B, the Court finds Agent Chadborn's testimony to be highly credible.

20.  The Court concludes that, with regard to Statement 1, Agent Chadborn acted in good faith and conducted himself reasonably under the circumstances.  He explicitly informed Mr. McCarthy that he was having difficulty understanding him.  When Mr. McCarthy stated "I don't want nothing to say to anyone" in a more intelligible manner, Agent Chadborn, who still did not fully understand the statement, once again sought clarification, i.e., "You don't have anything to say to anybody?"  To which, Mr. McCarthy responded with a somewhat ambiguous "No."  Agent Chadborn, who evidently remained confused, began to ask Mr. McCarthy a non-interrogation question about the previous advisement of rights by Agent Barrera–"Okay. Did, did ... when they read you your rights ..."–but he was interrupted by Mr. McCarthy who invited additional conversation by asking: "What rights?" *See Bradshaw*, 462 U.S. at 1041-42; *Innis*, 446 U.S. 301-02. Agent Chadborn then asked another non-interrogation question: "Did, did they read you your *Miranda* warnings?" *See Innis*, 446 U.S. 301-02.  Mr. McCarthy once again evidences a desire to discuss his rights: "What rights do I have?"  *See Bradshaw*, 462 U.S. at 1041-42.  At which time, Agent Chadborn decided that the appropriate course of action was to re-advise Mr. McCarthy of his *Miranda* rights. *See Mosley*, 423 U.S. at 106.

17

21.  Mr. McCarthy evinced a willingness and a desire for a generalized discussion about his rights by asking Agent Chadborn questions about his rights and requesting that Agent Chadborn retrieve his glasses from the truck, to allow him to read the *Miranda* warnings himself. *See Bradshaw*, 462 U.S. at 1045-46.

22.  When Agent Chadborn returned with Mr. McCarthy's glasses, Agent Watkins became involved in the discussion.  The break in the discussion did not constitute a significant period of time, but it is still noteworthy in the context of this case. *See Mosley*, 423 U.S. at 106.

23.  Without asking Mr. McCarthy any questions or their equivalent that could be characterized as interrogation, the Agents explained their role as investigating officers. *See Innis*, 446 U.S. at 301-02.  Mr. McCarthy evinced a desire to pursue a broader conversation with the officers by stating "get to the point." *See Bradshaw*, 462 U.S. at 1045-46.

24.  In response to Mr. McCarthy's request for them to "get to the point," Agent Chadborn explained that the point was to determine whether or not Mr. McCarthy wished to cooperate with their investigation.  Mr. McCarthy then evinced his desire to pursue an even broader conversation by asking the Agents "What is the cooperation?" and by spontaneously explaining all the ways in which he had cooperated with the arresting law enforcement officials. *See Id.*

25.  At that point, the Agents demonstrated respect for Mr. McCarthy's rights by stopping the conversation and providing Mr. McCarthy with a full and effective warning of his rights. *See Miranda*, 384 U.S. at 444-45.  This was the second time Mr. McCarthy had been advised of his rights during the approximately two and a half hours in which he had then been in custody.

26.  Mr. McCarthy clearly demonstrated that he understood his rights, verbally stating that he understood them and placing his initials by each statement of rights to indicate his comprehension.  Indeed, there is no question that Mr. McCarthy, who is a mature adult of at least

average intelligence, was fully aware of the nature of his rights. *See Hernandez*, 93 F.3d at 1501.

27.  Mr. McCarthy asked several questions of the Agents regarding what would happen if he waived his rights and what would happen if he did not waive his rights, demonstrating that he was undecided about whether or not he wished to speak to the Agents and was weighing his options. The Agents repeatedly attempted to clarify that they could not discuss the case with Mr. McCarthy unless he made a decision to waive his rights. The Agents repeatedly explained that Mr. McCarthy could choose not to talk to them or stop questioning at any time.  The Agents also repeatedly emphasized that Mr. McCarthy needed to make a choice whether or not he wanted to talk to them.

28.  Agent Chadborn and Watkins did not attempt to wear down Mr. McCarthy's resistance or make him change his mind. *See Mosely*, 423 U.S. at 105-06.  Instead, in response to several inquiries from Mr. McCarthy, the Agents made several good faith attempts to explain to Mr. McCarthy the possible repercussions he could face if he decided to waive his rights and if he decided not to waive his rights, always emphasizing that Mr. McCarthy needed to make the decision, that they could not interrogate him unless he decided to waive his rights, and that he could stop the questioning at any time.  At no time did the Agents physically coerce, verbally abuse, or otherwise threaten Mr. McCarthy. *See Glover*, 104 F.3d at 1582.

29.  During the approximately fifteen minutes in which Agents Chadborn and Watkins spoke with Mr. McCarthy about his rights, the Agents did not ask Mr. McCarthy any questions that could legally be characterized as interrogation. *Innis*, 446 U.S. at 301-02.

30.  The totality of the circumstances indicated that Mr. McCarthy ultimately chose to waive his Miranda rights, as evidenced by his choice to sign the waiver of rights form and the following statements he made to the Agents: "Ask the question;" "Yeah, I'm going to talk;" "Whatever I can answer, I answer. Whatever I can't, I leave that alone." *Hernandez*, 93 F.3d at 1501.

31.  Mr. McCarthy's waiver of his rights was knowing, intelligent, and voluntary. *See Miranda*, 384 U.S. at 444-45.  He considered his options and made a choice to speak with the Agents.  Mr. McCarthy's choice to waive his rights was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Hernandez*, 93 F.3d at 1501.  Mr. McCarthy's waiver of his rights was made in full awareness of the nature of the rights being waived and the consequences of waiving. *Id.*

32.  Mr. McCarthy's will was not overcome by police coercion or by the circumstances of the interrogation, including the length, location, or conditions of the interrogation. *Withrow*, 507 U.S. at 693-94.  Mr. McCarthy was mature and intelligent enough to fully understand the consequences of his choice. *See Id.*  His decision-making was not impaired by a physical or mental health condition. *See Id.*  Furthermore, he made his choice after being appropriately advised of his rights. *See Id.*

33.  Mr. McCarthy did not ever clearly and unequivocally invoke his right to remain silent. *See Davis*, 512 U.S. at 459; *Nelson*, 450 F.3d at 1211-12.  Although Statement 1 contains language that could be understood as an expression by Mr. McCarthy of his desire to remain silent, Mr. McCarthy, of his own accord, almost immediately contradicted himself by expressing his willingness to engage in a conversation with Agent Chadborn regarding his rights. *See Bradshaw*, 462 U.S. at 1041-42.  Mr. McCarthy then continued to demonstrate his willingness to engage in a conversation with Agent Chadborn and Watkins by asking them additional questions, until he ultimately made the knowing, intelligent, and voluntary choice to waive his rights. *See Hernandez*, 93 F.3d at 1501. *Bradshaw*, 462 U.S. at 1041-42.

34.  Approximately three and a half hours after Agents Chadborn and Watkins had interrogated Mr. McCarthy, Special Agent Hansen, without re-advising Mr. McCarthy of his rights,

interrogated Mr. McCarthy for less than five minutes in the DEA prisoner processing area.

35.  The totality of the circumstances indicate that Mr. McCarthy's decision to inculpate himself by speaking with Special Agent Hansen was voluntary, knowing, and intelligent. *Hernandez*, 93 F.3d at 1501. Because Mr. McCarthy had previously waived his Miranda rights, indicated his willingness to cooperate with law enforcement officials, and not previously invoked his rights, it would be an unnecessary extension of the prophylactic protections of the actual right against compelled self-incrimination to suppress inculpatory statements made by Mr. McCarthy to Special Agent Hansen. *See Mosley*, 423 U.S. at 106; *Patane*, 542 U.S. at 636.

## CONCLUSION

The admission into evidence of all of Mr. McCarthy's incriminating statements made to Agents Chadborn and Watkins and Special Agent Hansen does not violate the principles of *Miranda*. *Miranda*, 384 U.S. at 444-45.

**WHEREFORE,**

**IT IS ORDERED** that Mr. McCarthy's Motions to Suppress Statements are **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**